Alexander Del Giorno, J.
The claimant, an insurance investigator and adjustor, who resides in Brooklyn, left there about 4:00 a.m. on Sunday, August 19, 1962, to visit his brother-in-law in Oneonta. He was driving a 1956 Plymouth in which he was accompanied by his wife and two children. They stopped on the Thruway for a quick breakfast.
At about 8:00 a.m., while he was driving north on Boute 42, a State highway, south of Lexington, at a speed of about 30 miles per hour, he met with an accident. When about to round a sharp left turn in the road just below a bridge, he claims his vehicle passed over loose gravel, pebbles, and black tar particles the size of a quarter which caused him to skid first into the dirt shoulder to his right, then veer straight forward, and then, out of control, veer again at an angle to his right, knocking down some guardrails, and then tumble almost 40 feet down the embankment close to the bridge where he came to a stop against a tree.
He stated that as he started to skid he applied his brakes, but the car went out of control, resulting in the final outcome above described.
He also stated that as he started to round the curve he heard the debris underneath hit his car.
After the accident he was temporarily stunned but, despite his injuries, with the help of a passerby he helped his wife and children up the embankment. Miraculously, these latter were not injured.
His wife testified that, after they reached the roadway, he pointed out to her the debris, dirt and pebbles on the roadway, which she saw. She was not cross-examined nor was her testimony disputed. Claimant put in evidence four photographs which were taken by his brother-in-law three days after the accident.
On claimant’s Exhibit 5, he marked B where he began to brake his car and his line of travel to D, where debris was on the road where he began to skid.
On claimant’s Exhibit 6, he marked off the diamond-shaped sign to his right which indicated a curve ahead. On claimant’s Exhibit 7, he marked X as the place where he first veered off the *827 road onto the shoulder, and 0 where he struck the guardrails.
Claimant’s Exhibit 8 shows the bridge and location where the ear knocked down the guardrails and where the car went down the embankment.
The State put in evidence two photographs taken in the year 1965, which show the physical condition existing today and the curve in the road.
The testimony indicated that on June 7, 1962, the State had contracted with the Peckham Eoad Co. for the widening of the existing roadbed and for the resurfacing of Eoute 42, including the accident site which was some 250± feet from the north end of the job which commenced 7 miles south thereof. By this contract Peckham was to remove sod from the shoulders, excavate for the widening, place the gravel in the excavation, remove material dug and resurface with 2% inches of blacktop.
The testimony shows that the job proceeded from the south and continued at about a thousand yards a day; that the gravel was procured from banks south of the accident site while the blacktop was trucked from a plant located north of the accident site; and that the disposable material was disposed of in locations unknown to the State’s representatives who testified. He conceded that possibly disposal took place north of the accident site as well as in other areas.
Claimant’s brother-in-law, who then had resided in Oneonta for four years and was a high school teacher, testified that he travelled Eoute 42 often, and that for over a month before the accident he observed trucks going up and down Eoute 42 and saw at the curve in question loads shifting in trucks as they proceeded around the curve and saw debris fall on the highway Avhich debris was of a type similar to what he saAV on the day of the accident. On that day, pursuant to a phone call from his sister, ho first visited claimant at Greene County Hospital Avherc claimant remained until August 30, 1962, between 12:00 noon and 1:00 p.m. in the company of his sister, and then proceeded to the scene of the accident for the purpose of unloading the claimant’s car. When he arrived he found the car and content had already been moved, except for a beach bag which he retrieved at the bottom of the embankment. While at the scene, he examined the roadway and saw gravel, dried blacktop and pebbles which followed the curve line, with tire marks in the debris both on the road and the shoulder as well as the earthen embankment where the car had dropped.
Claimant’s Exhibits 5, 6, 7 and 8 were taken Avith a small camera by the brother-in-law three days later Avhen the road was clean.
*828 Arthur J. Peterson, a State Trooper at Leeds Barracks, subpoenaed by the claimant, testified that he answered a call concerning the accident. When he arrived, he learned that the claimant and family had been taken away.
He examined the scene and wrote in his official report that he found loose gravel on the highway at the beginning of the curve and noticed tire marks leading through the gravel, over the shoulder, onto the highway and at the embankment where the car had dropped. These tire marks led first towards a sign and then to the guardrails. (Note Claimant’s Exhibit 8 — two signs with the blank rear facing oncoming traffic.)
The trooper further stated that he saw dirt and stones on the paved road, the dirt being loose dirt. He could not recall if he saw blacktop.
As a witness for the State, Royal Ribky, engineer in charge of the resurfacing contract for the Department of Public Works, testified that to the best of his knowledge the road was clean on Saturday, August 18, 1962, which was the day before the accident. He stated, too, that August 16 was the first day blacktop was brought on the job and truck deliveries had continued on August 17 and 18. He also stated that the work started on August 6, 1962. On the date of the accident the work had progressed to about 1 mile south of the accident.
He further testified that he did not know if the roadway of Route 42 was swept; he merely surmised it was from the obligations imposed by the contract. He could not say whether any blacktop fell at the curve in spite of precautions required by the contract that loaded trucks be covered with tarpaulin. He did concede, however, that if debris was dropped on the road it was the duty of the contractor to clean it and his own duty to see that it was done.
John D. Barkovich, another State witness who was charged with patrolling the operation to insure that the contractor performed his work according to schedule, failed to present his job diary either at the examination before trial or at the trial, and essentially testified that to the best of his knowledge the tar trucks came covered with tarpaulin.
He visited the scene the next day (Monday) and he stated that as far as he could see the road then was clean. He also stated that an accumulation of debris on the road, if left there, would reflect adversely upon him.
He said he saw no tire marks on Monday.
George Cartwright, the last State witness, who was the watchman for Peckham, stated that it was part of his duty to see that the road was kept clean. He admitted that if it was *829 not it also would reflect adversely against Mm. He testified that he had crossed the road on Saturday, August 18, 1962, at 7:00 p.m. and 11:00 p.m., at which times he insisted it was clean. He further testified that right after the accident he was on the scene and saw no gravel on the highway or tire marks. When reminded that the trooper had found dirt and gravel on the highway, even though the trooper arrived at the scene after he did, he repeated that he saw neither gravel, debris nor tire marks.
In rebuttal, claimant recalled claimant’s brother-in-law, who stated that he visited the scene on Monday, August 20, at 4:00 p.m. At that time, he saw two men sweeping the road, using a small truck and shovel and broom.
An extended and meticulous account of the testimony has seemed necessary for the proper distillation of the truth.
The questions presented are: Were there, on the travelled portion of Route 42, debris, gravel, dirt and dry, discolored and broken asphalt at this sharp and dangerous curve which was the proximate cause of this accident? Was the State responsible therefor? Was the claimant free from contributory negligence ?
From the believable evidence, particularly the testimony of the trooper who had no interest at all except that of duty, the court is fully satisfied that there were debris, gravel and dirt of sufficient quantity to cause the skid of claimant’s car as above described. The trooper’s testimony imprints the truth on the claimant’s testimony, his wife’s and his brother-in-law’s, and at the same time weakens the already weak and indifferent testimony of the State’s witnesses.
Here was a relatively big contract being carried out with great expedition. How many trucks were used? The testimony did not disclose that fact. However, common sense compels the presumption that a large number of trucks must have been engaged to bring out the old and move in the new material on a job progressing at more than one-half mile per day. Those types of trucks are capable of carrying from at least 5 cubic yards to even 9 cubic yards and more of material and it is common knowledge that they are usually overfilled. Surmise then, if one can, what would happen when such trucks round a sharp curve as we have here.
The court has concluded, as a result of the testimony, that it was inevitable that portions of the truck content would spill and did spill under such circumstances; and that, furthermore, the debris was left unswept on Saturday afternoon and removed only on the Monday following.
*830 The State contends that there were adequate signs, that there was no proof of any prior accident or any notice given to the State of the alleged dangerous condition and calls upon the doctrine of Boyce Motor Lines v. State of New York (280 App. Div. 693, 696) to sustain its position of no liability.
The court finds against the State on all points raised above in its defense. It finds such argument is not apropos here. This is not the case of an alleged existing defect in the highway. This is a danger present, immediate and just superimposed on an already serious curve. This claim concerns itself with an act of commission or omission on the part of the State that placed at the site and left there foreign substances which created negligence where none could have been claimed before the happening.
The court is of the opinion that claimant was not contributo rily negligent, for the reason that he was traveling at 30 miles an hour, the posted speed, and could not perceive the danger until he was on top of it, when it was too late to do anything about it other than to try, as he did, to avoid the accident which could not be avoided.
The court finds the claimant free of contributory negligence while it finds the condition created at that curve to be the proximate cause of the accident which arose out of a negligent act by the contractor’s agents of which the State had notice, either direct or implied, and had done nothing to cause its elimination in conformity with its nondelegable duty to maintain its highways clean, passable and free of alien substances.
The claimant remained in Memorial Hospital, Catsldll, from August 19, 1962 to August 30, 1962. The diagnosis indicated laceration of left forehead, left lower lip, chin, right wrist, depressed fracture of sternum with overriding of fragments with involvement of the muscles, tissues, etc., necessitating open reduction surgery. The lacerations required debridement and repair. The left knee was also injured. At the trial, scars were visible but not impairing. The claimant’s recovery was excellent.
Hpon discharge from the hospital, claimant rested in Oneonta for one and one-half weeks. He felt some pains while there but had no doctor in attendance. On his return home, he remained home and in bed for some six weeks. He received therapy treatments at a doctor’s office in Brooklyn.
Claimant was an insurance adjustor earning from $90 to $120 weekly, which he lost while away from work. His car was completely destroyed.
*831 The State did not question the claimant’s losses and expenses which we itemize thus:
Hospital .......................... $371.96
Doctors ........................... 435.00
Automobile........................ 375.00
Salary............................ 600.00
$1,781.96
Although the claimant claims that he continues to feel at time some of his pains, the court believes he is well cured as a result of an excellent recovery.
The court awards to the claimant the above sum of $1,781.96 for loss and expenses and $3,000 for his injuries, making a total of $4,781.96, plus interest on $375 from August 19, 1962 to the date of entry of judgment.